**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

JOAN LAWRENCE, as Special )
Administrator of the Estate of )
RONALD L. HUNTLEY, )
                                                      )
        Plaintiff, )
                                                      )
v. )        Case No. 10-CV-17-GKF-FHM
                                                      )
CITY OF OWASSO, a municipal )
corporation of the State of Oklahoma, )
                                                      )
       Defendant. )

**OPINION AND ORDER**

Before the court is Defendant's Motion for Summary Judgment [Dkt. # 90].

On September 27, 2012, the Tenth Circuit affirmed the grant of summary judgment in favor of two defendant police officers and the City of Owasso ("City" or "Owasso") on plaintiff's § 1983 claims, but vacated the grant of summary judgment in favor of the City on plaintiff's state-law negligence claims, and remanded for further proceedings. Shortly after remand, Ronald L. Huntley ("Mr. Huntley") passed away, and the court granted a motion to substitute Joan Lawrence, as Special Administrator of the Estate of Ronald L. Huntley, as plaintiff. United States District Judge James H. Payne set a new scheduling order, including a deadline for dispositive motions. Owasso timely filed the motion now before the court. On June 27, 2013, Judge Payne recused, and the case was reassigned to the undersigned.

**I. Material Facts**

On March 31, 2009, Susan Huntley called 911 and stated that her husband Ronald was "being violent to me. He just knocked me clear down . . . [r]ight in the throat." [Dkt. # 92, Ex. 1, pp. 1-2]. In response to the dispatcher's questions, Ms. Huntley responded that there were lots of

weapons in the house and that Mr. Huntley was on the back porch. [*Id.*]. The dispatcher advised the police officers that "the wife is saying he knocked her across the room and there are lots of weapons in the house. Suspect is now on the back porch." [*Id.* at 3]. Dispatch also advised that there was no prior call history from this residence. [*Id.* at 4].

Owasso police officers Tim Hutton and Jarod Mitchell were the first to arrive at the Huntleys' home. [Dkt. # 38, Ex. 3, ¶ 4].[1] Both officers are CLEET certified; Officer Mitchell was certified in 2005 and Officer Hutton was certified in 2006. [Dkt. # 90, Defendant's Statement of Uncontroverted Facts ¶¶ 1-2; Dkt. # 92, Plaintiff's Response to Defendant's Statement of Uncontroverted Facts ¶ 1]. Both officers were working that day in their official capacities as patrol officers. [Dkt. # 38, Ex. 3, ¶ 2; *Id.*, Ex. 4, ¶ 2; Dkt. # 90, Defendant's Statement of Uncontroverted Facts ¶ 3; Dkt. # 92, Plaintiff's Response to Defendant's Statement of Uncontroverted Facts ¶ 1].

Officer Mitchell's patrol car was equipped with an "ICOP" video and audio recording system. [Dkt. # 38, Ex. 3, ¶ 3]. Although the dashboard-mounted camera was not pointed toward the house, the system also included a belt microphone that continued to record audio after Officer Mitchell left the car and approached the house. [*Id.*]. The officers first tried a gate leading to the Huntleys' backyard, but found it locked. [Dkt. # 38, Ex. 4, ¶ 4]. Officers Hutton and Mitchell then went to the front entrance. The front entrance included a small porch with a front door protected by a closed storm door. [Dkt. # 90, Defendant's Statement of Uncontroverted Facts ¶¶ 7, 23; Dkt. # 92, Plaintiff's Response to Defendant's Statement of Uncontroverted Facts ¶¶ 3, 13]. The officers heard Mr. Huntley inside tell someone, "I don't want you ever talking to (unintelligible)." [Dkt. # 38, Ex. 4, ¶ 5; Dkt. # 92, Plaintiff's Response

---

[1] Docket # 38 is Owasso's first Motion for Summary Judgment. In its second Motion for Summary Judgment, at Docket # 90, counsel for Owasso adopts the exhibits filed in connection with Docket # 38. [Dkt. # 90, pp. 8-16].

to Defendant's Statement of Uncontroverted Facts ¶ 3, *Id.*, Ex. 1, p. 6].[2]  Officer Mitchell did not see any weapons at this point. [Dkt. # 92, Plaintiff's Additional Disputed and Material Facts ¶ 1; *Id.*, Ex. 8, p. 20; Dkt. # 99, Defendant City's Response to Plaintiff's Material Facts at p. 4]. Officer Mitchell noticed that Mr. Huntley was elderly. [Dkt. # 92, Plaintiff's Additional Disputed and Material Facts ¶ 2; *Id.*, Ex. 8, p. 17; Dkt. # 99, Defendant City's Response to Plaintiff's Material Facts at p. 4].

The officers ordered Mr. Huntley to come outside. [Dkt. # 38, Ex. 4, ¶ 5]. The parties dispute exactly what happened next. Plaintiff alleges Mr. Huntley tried to comply with the order, but the officers did not give him the chance. [Dkt. # 92, Ex. 5, p. 6]. Instead, Officer Mitchell knocked a book from Mr. Huntley's hand, the officers grabbed him by the arms, and "they jerked [him] out the door." [Dkt. # 92, Ex. 5, p. 3]. As Mr. Huntley described at his deposition,

> it felt like a bolt of lightning had hit me. It went up my arm to my neck and down my spine, and I was in a lot of pain. The next thing I knew, I was on the outside and somehow I had been thrown on my back or my stomach. I had been flipped somehow, but I don't remember how it was done.

[*Id.*]. Plaintiff alleges Mr. Huntley suffered injuries to his back and neck from the officer's use of force.[3]

For their part, the officers assert that Mr. Huntley started to close the front door and retreat into the house. [Dkt. # 38, Ex. 3, ¶ 5; *Id.*, Ex. 4, ¶ 5]. Fearing a possible hostage situation, Officer Mitchell knocked the book out of Mr. Huntley's hand, grabbed his left arm, and applied an arm bar. Officer Hutton placed Mr. Huntley's right arm into an arm bar hold. [Dkt. # 38, Ex. 3, ¶ 5; *Id.*, Ex. 4, ¶ 5]. Officer Mitchell was trained in this technique in his

---

[2] Plaintiff disputes that Mr. Huntley made such a statement, but the 911 recording contradicts the assertion. A party does not create a genuine issue of material fact by disputing a valid recording. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

[3] Plaintiff alleges Mr. Huntley "immediately . . . informed officers that he had had back surgery just three months prior." [Dkt. # 92, p. 5]. However, as the circuit panel noted, the assertion is not supported by the record, particularly the ICOP recording. Therefore, plaintiff has not created a genuine issue of fact as to this matter. *See Scott,* 550 U.S. at 380.

defensive tactics and custody and control training as a police officer. [*Id.*, Ex. 3, ¶ 5; Dkt. # 90, Defendant's Statement of Uncontroverted Facts ¶ 12; Dkt. # 92, Plaintiff's Response to Defendant's Statement of Uncontroverted Facts ¶ 7]. Together the officers pulled Mr. Huntley through the doorway, across the porch, and into the front yard. [Dkt. # 38, Ex. 3, ¶ 5; *Id.*, Ex. 4, ¶ 5]. The officers allege Mr. Huntley resisted by pulling backwards after they applied the arm bar holds. [Dkt. # 38, Ex. 3, ¶ 5; *Id.*, Ex. 4, ¶ 5]. Therefore, once they reached the yard, Officer Mitchell performed a leg sweep causing Mr. Huntley to fall to the ground. [Dkt. # 38, Ex. 3, ¶ 6; *Id.*, Ex. 4, ¶ 6]. It is undisputed that both officers kept hold of Mr. Huntley's arms "the entire way down to the ground" and that Officer Mitchell was trained in this technique. [Dkt. # 38, Ex. 3, ¶ 6; *Id.*, Ex. 4, ¶ 6; Dkt. # 90, Defendant's Statement of Uncontroverted Facts ¶¶ 15, 17; Dkt. # 92, Plaintiff's Response to Defendant's Statement of Uncontroverted Facts ¶¶ 1, 9]. The officers then handcuffed Mr. Huntley and placed him in a seated position. [Dkt. # 38, Ex. 4, ¶ 8]. Mr. Huntley sustained injuries to his back and neck. [Dkt. # 92, Ex. 14, pp. 1-3]. There were four officers present at the time Mr. Huntley was taken out into the yard. [Dkt. # 92, Plaintiff's Additional Disputed and Material Facts ¶ 11; Dkt. # 99, Defendant City's Response to Plaintiff's Material Facts at p. 5].

Mr. Huntley did not recall the circumstances under which the leg sweep occurred. He explained that he "was in shock" after Officer Mitchell applied the first arm bar hold, and could not remember certain events thereafter. [Dkt. # 38, Ex. 7, p. 7]. In his deposition, upon being asked, "Do you remember how you got taken to the ground?" Mr. Huntley responded, "No, I do not. I assume they knocked my feet out from under me, and I wound up on the ground." [*Id.*]. Mr. Huntley explained, "The next thing I knew, I was on the outside and somehow I had been thrown on my back or my stomach. I had been flipped somehow, but I don't remember how it

4

was done." [Dkt. # 92, Ex. 5, p. 3]. Similarly, Mr. Huntley stated he could only "guess [he] landed however [the officers] wanted [him] to land" and that he thought he landed on his "back, but [he was] not sure." [Dkt. # 38, Ex. 7, p. 8]. Mr. Huntley explained it all happened "in a split second," in "a flash," and perhaps in "a matter of seconds." [Dkt. # 92, Ex. 5, pp. 4-5, 7].

Ms. Huntley observed Mr. Huntley try to shut the front door, but she did not know whether Mr. Huntley saw the officers. [Dkt. # 92, Ex. 12, p. 2]. Ms. Huntley explained that a female officer hurried her to the back of the house, where she could not observe Mr. Huntley's interactions with the officers at the front door. [*Id*. at 2-3].

The Huntleys' front entrance specifically concerned Officer Mitchell because it "was confined and there was no way for Officer Hutton or me to move to a safe position if someone from inside the house produced a firearm." [Dkt. # 38, Ex. 3, ¶ 9]. This influenced Officer Mitchell's decision to "secure Mr. Huntley as soon as [he] could." [*Id.*]. Both officers had been taught "that domestic violence calls are among the most dangerous for officers to handle because of the emotionally unstable condition of the participants and the unpredictability of their behavior." [Dkt. # 38, Ex. 3, ¶ 10; *Id.*, Ex. 4, ¶ 7]. Both officers recount that the entire incident occurred "very quickly." [Dkt. # 38, Ex. 3, ¶ 5; *Id.*, Ex. 4, ¶ 5].

Mr. Huntley was arrested and initially charged with domestic abuse by strangulation, resisting arrest, and obstructing an officer. The charges were later modified to domestic assault and battery and obstructing an officer. Eventually, due to Ms. Huntley's noncooperation, the charges were dropped. [Dkt. # 90, p. 7].

## II. Standard of Review

The court shall grant summary judgment if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.

5

56(c). When reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). "However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Id.* The court cannot resolve material factual disputes at summary judgment based on conflicting affidavits. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). However, the mere existence of an alleged factual dispute does not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). If the evidence viewed in the light most favorable to the nonmovant fails to show a genuine issue of material fact, the moving party is entitled to judgment as a matter of law. *Id.*

### III. Discussion

#### A. Immunity Under 51 O.S. Section 155(6)

Owasso contends it is immune from liability under 51 O.S. § 155(6), which affords immunity to a governmental subdivision for claims that result from "the failure to provide, or the method of providing, police, law enforcement or fire protection." Section 155(6) does not provide municipalities with *a priori* immunity where a plaintiff seeks recovery for allegedly tortious acts of law enforcement personnel in the use of force to effect an arrest. *Morales v. City of Oklahoma City*, 230 P.3d 869, 876 (Okla. 2010). Owasso is not entitled to § 155(6) immunity under the uncontested material facts in this case, wherein plaintiff alleges Officers Mitchell and Hutton negligently used excessive force in effecting Mr. Huntley's arrest.

### B. Vicarious Liability

Plaintiff alleges that Owasso was vicariously liable for the officers' negligence. Specifically, she contends Owasso is vicariously liable because Officers Mitchell and Hutton acted negligently in applying arm bar holds and a leg sweep in arresting Mr. Huntley. Section 153 of the Oklahoma Governmental Tort Claims Act ("OGTCA") provides that a municipality is liable for loss resulting from the torts of its employees acting within the scope of their employment. 51 O.S. § 153(A). To succeed on a theory of vicarious liability against Owasso, plaintiff must show that the officers were negligent. *See Hooper ex rel. Hooper v. Clements Food Co.*, 694 P.2d 943, 944-95 (Okla. 1985).

Here, Owasso does not dispute that it owed a duty of care to Huntley, and the court will adopt the assumption "that a police officer owes a negligence based duty of care to an arrestee to protect the arrestee from injury." *Morales*, 230 P.3d at 878. In Oklahoma, "[a] police officer's duty is very specific: it is to use only such force in making an arrest as a reasonably prudent police officer would use in light of the objective circumstances confronting the officer at the time of the arrest." *Id*. at 880. In applying this standard, the question is whether the objective facts support the degree of force employed. *Id.*

Among the factors that may be considered in evaluating the objective reasonableness of an officer's use of force in making an arrest are: (1) the severity of the crime of which the arrestee is suspected; (2) whether the suspect poses an immediate threat to the safety of the officers or others; (3) whether the suspect is actively resisting arrest or attempting to evade arrest; (4) the known character of the arrestee; (5) the existence of alternative methods of accomplishing the arrest; (6) the physical size, strength, and weaponry of the officers compared to those of the suspect; and (7) the exigency of the moment. *Id.* While no list can exhaust the

possible considerations in a totality-of-the-circumstances evaluation, these factors are illustrative of those to be considered in assessing what a reasonable police officer would do under the circumstances. *Id.* at 880 n.48. The first three factors are those enumerated by the United States Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). *Morales*, 230 P.3d at 880 n.48.

The first factor focuses on the severity of the crime at issue. The officers were responding to a complaint of domestic violence. Under Oklahoma law, domestic abuse may be either a misdemeanor or a felony, depending on the circumstances. 21 O.S. § 644. At the time of the arrest, the officers did not know the severity of Mr. Huntley's actions. Faced with potentially felonious domestic violence, the first *Morales* factor weighs in the officers' favor.

The second factor is whether the suspect posed a threat. The officers knew that the alleged domestic violence perpetrator remained on the scene. They were informed that Mr. Huntley had "knocked" the victim "across the room." [Dkt. # 92, Ex. 1, p. 3]. The officers had good reason to believe Mr. Huntley potentially possessed firearms or other dangerous weapons, as dispatch had informed them "there are lots of weapons in the house," even though they did not observe a weapon upon encountering Mr. Huntley. [*Id.*]. Also, the officers had been trained "that domestic violence calls are among the most dangerous for officers to handle because of the emotionally unstable condition of the participants and the unpredictability of their behavior." [Dkt. # 38, Ex. 3, ¶ 10; *Id.*, Ex. 4, ¶ 7]. Moreover, when Officer Hutton opened the exterior storm door to the house, he overheard Mr. Huntley say, "I don't want you ever talking to (unintelligible)." [Dkt. # 38, Ex. 4, ¶ 5; Dkt. # 92, Ex. 1, p. 6]. The front entry way was a confined space, which left the officers vulnerable if the suspect produced a firearm. [Dkt. # 38, Ex. 3, ¶ 9]. Given these circumstances, it was reasonable for the officers to believe that Mr.

8

Huntley could present an immediate threat to the safety of Ms. Huntley and the officers themselves.

The third factor is whether the suspect resisted arrest. The Tenth Circuit concluded that a material fact was in dispute as to whether Mr. Huntley resisted arrest prior to the application of the arm bar. *Huntley*, 2012 WL 4458342, at *4-5. No newly discovered facts on remand suggest a different conclusion; thus, for purposes of summary judgment the court assumes that Mr. Huntley did not resist the officers while at his front door prior to application of the arm bar. *Id.* The Tenth Circuit also concluded that there was nothing in the record to contradict the officers' assertions that Mr. Huntley resisted against their hold and pulled backwards as they moved him to the yard. *Id.* at *5-6. No newly discovered facts on remand suggest a different conclusion. Thus, as to the arm bar, the third factor does not preclude the officers' use of force. As to the leg sweep, the third factor favors the officers' use of force, as Mr. Huntley actively resisted the officers after application of the arm bar.

The fourth factor is the known character of the arrestee. Based on their conversation with dispatch, the officers understood that there was no prior history of 911 calls from the Huntley residence, but that the suspect had just "knocked" the victim "across the room" and had "lots of weapons in the house." [Dkt. # 92, Ex. 1, pp. 3-4]. Given the elements of the report they received from the dispatcher, the officers understood the arrestee's character to be dangerous. This factor therefore weighs in favor of the officers.

The fifth factor is the existence of alternative methods of accomplishing the arrest. Plaintiff relies upon the unsworn opinion of Michael D. Lyman, Ph.D., for the proposition that the officers should have utilized "verbal commands and de-escalation language" before using any force. [Dkt. # 92, Ex. 6, pp. 1-12]. Unsworn expert reports are not competent to be

considered on a motion for summary judgment. *Sofford v. Schindler Elevator Corp.*, 954 F. Supp. 1459, 1462-63 (D. Colo. 1997) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17 (1970)). Even if Dr. Lyman's report could be considered, it would be insufficient to raise a genuine dispute because Dr. Lyman relied upon facts contrary to the undisputed material facts before this court. First, Dr. Lyman assumed Mr. Huntley did not resist the officers after being placed in the arm bar. Second, he discounted the uncontested fact that Mr. Huntley pulled backward as the officers moved Mr. Huntley to the yard. [Dkt. # 92, Ex. 6, p. 8]. Third, Dr. Lyman improperly read Officer Mitchell's testimony that the officers had "both *arms* secured" to mean that Mr. Huntley was completely "secured" at the time the officers moved him to the yard. [Dkt. # 92, Ex. 6, p. 8; *Id.*, Ex. 8, p. 9] (emphasis added).

With respect to the arm bar holds, the officers decided to secure Mr. Huntley "as soon as [they] could" because the front entrance "was confined and there was no way for Officer Hutton and [Officer Mitchell] to move to a safe position if someone from inside the house produced a firearm." [Dkt. # 38, Ex. 3, ¶ 9]. The officers knew that an alleged domestic violence perpetrator was in the doorway between the officers and the victim. [Dkt. # 38, Ex. 3, ¶ 5; *Id.*, Ex. 4, ¶ 7]. As they approached, the officers heard Mr. Huntley state, "I don't want you ever talking to (unintelligible)." [Dkt. # 38, Ex. 4, ¶ 5; Dkt. # 92, Ex. 1, p. 6]. On its face this comment indicates an ongoing dispute. In a split second, the officers had to choose whether to (1) talk with Mr. Huntley and risk that he—a potentially armed suspect—might retreat into the home with the victim, or (2) immediately remove Mr. Huntley from the close confines of the entryway. The court concludes that, although the use of words alone was *theoretically* an alternative, the information previously provided to the officers, the statement they overheard, the fast pace of events, the close confines of the entryway, and the risk of inaction led the officers to

the reasonable conclusion that the arm bar should be used.  Further, as the circuit panel observed, there is no genuine dispute that both the arm bar and the leg sweep were performed in any other way than the officers had been trained to do.

With respect to the leg sweep, there is nothing in the record to contradict the officers' assertions that Mr. Huntley struggled against their hold and pulled backward.  Mr. Huntley's resistance made the leg sweep objectively reasonable.  Both officers held onto Mr. Huntley's arms "the entire way down to the ground." [Dkt. # 38, Ex. 4, ¶ 5].  The officers then handcuffed Mr. Huntley and placed him in a seated position.  [Dkt. # 38, Ex. 4, ¶ 8].  Under these circumstances, the court concludes it was objectively reasonable for the officers to forgo alternative methods of arresting Mr. Huntley.

The sixth factor addresses the physical size, strength, and weaponry of the officers compared to those of the suspect.  Four officers were present at the time of Mr. Huntley's arrest. [Dkt. # 92, Plaintiff's Additional Disputed and Material Facts ¶ 11; Dkt. # 99, Defendant City's Response to Plaintiff's Material Facts at p. 5].  Officer Mitchell perceived Mr. Huntley to be elderly upon encountering him.  [Dkt. # 92, Plaintiff's Additional Disputed and Material Facts ¶ 2; Dkt. # 99, Defendant City's Response to Plaintiff's Material Facts at p. 4].  The officers carried firearms.  And although the dispatcher advised that Mr. Huntley had "lots of weapons," he was not armed at the time of the incident.  This factor weighs in plaintiff's favor because Mr. Huntley was outnumbered four-to-one by younger officers carrying firearms.

The seventh factor assesses the exigency of the moment.  The entire incident, from the time the officers first spoke to Mr. Huntley to when they completed the leg sweep, took less than thirty seconds.  The officers faced an alleged domestic violence perpetrator in a home reportedly containing "lots of weapons." [Dkt. # 92, Ex. 1, p. 3].  The officers heard Mr. Huntley say, "I

don't want you ever talking to (unintelligible)," a statement that suggested the domestic dispute was ongoing. [Dkt. # 38, Ex. 4, ¶ 5; Dkt. # 92, Ex. 1, p. 6]. Due to the confined entryway, there was no safe position to which the officers could retreat if Mr. Huntley produced a firearm. [Dkt. # 38, Ex. 3, ¶ 9]. Given these facts, the exigency factor weighs in the officers' favor.

In sum, as to the arm bar, the first, second, fourth, fifth, and seventh factors weigh in favor of the officers. The third and sixth factors weigh in favor of the plaintiff. The officers were faced with a suspect who had allegedly just battered his wife and had "lots of weapons," potentially firearms, in the home. The officers encountered a confined front entryway that did not afford a safe position to retreat if Mr. Huntley produced a firearm. Likewise, the narrow entryway and Mr. Huntley's position separated the officers from the victim. The officers assessed these factors in a split second and decided the safest solution was to secure Mr. Huntley with arm bar holds. Based upon all the factors discussed above, the court concludes that the officers exercised only such force in performing the arm bar holds as reasonably prudent officers would use in light of the objective circumstances confronting the officers at the time of the arrest.

As to the leg sweep, the first, second, third, fourth, fifth, and seventh factors weigh in favor of the officers. Only the sixth factor weighs in plaintiff's favor. After the officers placed Mr. Huntley in arm bar holds, he struggled against the officers by pulling backwards. In order to secure Mr. Huntley and place him in handcuffs, the officers utilized a leg sweep whereby they swept Mr. Huntley's leg and held his arms all the way to the ground to control his movement. Once in this position, the officers handcuffed Mr. Huntley and placed him in a seated position. Although the officers were younger than Mr. Huntley and outnumbered him, the court concludes the officers exercised only such force in performing the leg sweep as reasonably prudent officers

would use in light of the objective circumstances confronting the officers at the time of the arrest.

### C. Negligent Hiring, Training, and Supervision

Plaintiff also alleges Owasso is directly liable for its negligent hiring, training, and supervision of the officers. At footnote three of its Order and Judgment, the circuit panel noted that plaintiff "may have abandoned [her] claims of negligent training and hiring, but we will leave it to the district court to identify the negligence claims on remand." In his more recent brief, plaintiff again omits to mention negligent hiring at all. The court therefore concludes plaintiff has abandoned her claim of negligent hiring. Plaintiff continues to mention her claims of negligent training and supervision, but fails to raise any argument or point to any fact on the topic of allegedly negligent training. However, both claims continue to be made. As the court has concluded the officers did not breach their duty of care to Mr. Huntley, the claim against Owasso for negligent training and supervision is also defeated. *Huntley*, 2012 WL 4458342, at *7 ("[I]f the officers were not negligent, then the City would not be liable for negligent hiring, training, or supervision.").

### IV. Conclusion

WHEREFORE, Owasso's Motion for Summary Judgment is granted.

IT IS SO ORDERED this 21st day of February, 2014.

_____
GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT